IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Builders Mutual Insurance Company, | ) | C.A. No. 3:11-cv-400-CMC |
| | ) | |
| Plaintiff, | ) | OPINION AND ORDER |
| v. | ) | ON MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| Lacey Construction Co., Inc.; Lacey & | ) | |
| Associates, LLC; Gary Burch; Waverly | ) | |
| Place Phase II Homeowners Association; | ) | |
| and L. Michael Brown, individually, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Through this declaratory judgment action, Plaintiff, Builders Mutual Insurance Company

("Builders Mutual"), seeks a determination of the extent of its liability for damages which may be

awarded in a lawsuit currently pending against its insureds, Defendants Lacey Construction Co.,

Inc., Lacey & Associates, LLC, and Gary Burch (collectively "Lacey Defendants"). The underlying

lawsuit ("State Action") was filed by Defendants Waverly Place Phase II Homeowners Association

("Waverly HOA") and L. Michael Brown ("Brown") (collectively "Waverly Defendants") and

alleges, *inter alia*, that the Lacey Defendants are responsible for construction defects in the common

elements and townhomes in the Waverly Place Phase II Development ("Waverly Place").[1]

The matter is before the court on Builders Mutual's motion for summary judgment as to the

extent of its duty of indemnification.[2] Builders Mutual argues that it has no obligation to indemnify

---

[1]  For purposes of this motion, it is undisputed that Builders Mutual insured the Lacey Defendants under a series of commercial general liability policies which, collectively, provided coverage from November 22, 2002, to April 6, 2007. The portions of Waverly Place at issue in this action were built early in this period.

[2]  Builders Mutual has provided a defense in the State Action. Its duty of defense is not, therefore, at issue in this action.

the Lacey Defendants with respect to any of the Waverly Defendants' claims. Although it advances multiple grounds for its motion, Builders Mutual's primary argument is that the damages sought in the State Action do not fall within the policies' scope of coverage because they are not for physical injury to property caused by an occurrence. Instead, according to Builders Mutual, the damages sought are for construction defects or other contractual defaults which have not caused any damage to other property.

For the reasons set forth below. Builders Mutual's motion is granted in part and denied in part. More particularly, the court grants Builders Mutual's motion except as it relates to any damages which may be awarded to replace and pack certain areas of eroded soil.

## BACKGROUND

In moving for summary judgment, Builders Mutual focuses on the factual record in the still-pending State Action. It notes that, unlike its duty to defend, its duty to indemnify turns on what is proven at trial. Dkt. No. 44-1 at 9. Builders Mutual attaches substantial evidentiary support for its position as to what evidence has been adduced through discovery in the State Action. It also attaches the Waverly Defendants' interrogatory responses in this action which delineate the categories of damages sought in the State Action. Dkt. No. 59. This evidentiary record is discussed in Background § II below.

In opposing Builders Mutual's motion, the Lacey Defendants focus, primarily, on allegations of the State Action Amended Complaint, rather than pointing to the factual record. *See, e.g.*, Dkt. No 48 at 1-3. These allegations are discussed in Background § I below. Defendants also include some references to Brown's affidavit and the CGL policy and attach a "Supplemental Report" of a law professor who offers an opinion as to "[w]hether the allegations in the underlying complaint are

sufficient to raise questions of fact and therefore Summary Judgment is not appropriate." Dkt. No. 48-1at 1; *but see* Discussion § I (declining to consider expert report).

The Waverly Defendants' only response is a blanket adoption of the Lacey Defendants' responsive memorandum. Dkt. No. 56. The court will, therefore, refer to the sole response as "Defendants' Response" in the remainder of this order.

## I.    State Action Allegations.

The Waverly Defendants filed their State Action Complaint on June 9, 2008. The original complaint was superceded by an Amended Complaint filed on February 10, 2010. Dkt. No. 44-2, 44-3 (State Action Complaint and Amended Complaint). At some point, the action was dismissed but was restored to the active docket on December 10, 2010. *See* Dkt. No. 44-5 (order restoring action to the active docket).[3]

Waverly HOA's claims in the State Action relate to alleged defects in certain common areas, primarily relating to two retaining walls. Waverly HOA also refers to unspecified drainage problems in the Amended Complaint. Brown's claims relate to his individual unit, number 132, and focus on cracks in his concrete foundation slab and erosion above one of the two retaining walls (located immediately behind Brown's unit).[4] No claims of any other individual unit owners are at issue.[5]

---

[3] No information is provided as to the status of the case vis-a-vis discovery or trial date, although the matter apparently remains pending and substantial discovery has been completed as discussed in the next section of this order.

[4] Although not alleged in the complaint, Brown referred to some water intrusion issues during his deposition. These issues apparently arose in the spring of 2009, well after Builders Mutual's last policy expired.

[5] Waverly HOA and Brown sought to proceed on behalf of all unit owners in Waverly Place. The motion for class certification was, however, denied. *See* Dkt. No. 44-4 (State Action order dated December 3, 2009).

The State Action Amended Complaint alleges that Defendant Lacey & Associates acted as developer and Lacey Construction acted as builder for Waverly Place. Dkt. No. 44-3 at ¶¶ 6, 7. It further alleges that Defendant Gary Burch was affiliated with both the developer and the builder. *Id.* at ¶¶ 9, 15. In these roles, Burch allegedly supervised the construction of the common elements and homes and personally constructed the retaining walls. *Id.* at ¶¶ 15, 18.

**Retaining Walls.** The State Action Amended Complaint alleges that two retaining walls located in common areas owned by Waverly HOA are defective because they (1) fail to adequately retain the soil behind the walls and (2) allow erosion and silting below the walls. *Id.* at ¶¶ 20, 22. The alleged damages consist of the need to repair and maintain the walls to an extent which would not have been necessary had they been properly constructed. *Id.* at ¶ 21. For purposes of this order, the court will assume the erosion and silting constitute independent damage (that is, damage to something other than the retaining walls themselves), for which recovery is sought in the State Action.

**Drainage System.** The State Action Amended Complaint also alleges that there are defects in the drainage system. Dkt. No. 44-3 ¶¶ 16, 28-30. The nature of the defects is not specified, although the State Action Amended Complaint suggests there is some connection between defects in the retaining walls and defects in the drainage system. *Id.* ¶ 19. The Amended Complaint does not identify any specific damage to any property resulting from the alleged drainage problems.[6]

**Foundation Cracks.** The State Action Amended Complaint also alleges defects in non-common areas consisting of cracks in the concrete foundation slabs under many of the individual

---

[6] There is only one mention of drainage in Defendants' Response, and that is found in a block quotation of the Amended Complaint. *See* Dkt. No. 48 at 8. This suggests Defendants do not seek coverage of any claims for drainage-related damages under Builders Mutual's policies, although there is no express concession of the point.

units at Waverly Place. *Id.* at ¶ 36. Because class action status was denied in the State Action, the relevant allegations are now limited to allegations of foundation cracks under Brown's unit. Brown seeks recovery for the cost of repairing the cracks. *Id.* at ¶ 39. He also seeks damages for the decrease in value of his unit due to the cracks. *Id.* at ¶ 40.[7]

**Causes of Action.** The State Action Amended Complaint asserts six causes of action against the Lacey Defendants based on these factual allegations. The causes of action are founded on the following legal theories: (1) negligence; (2) breach of warranty for the drainage system and foundation cracks; (3) breach of contract; (4) nuisance; (5) breach of fiduciary duty; and (6) unfair trade practices.

## II.  Evidence in State Action.

It appears that substantial discovery has been conducted in the State Action including the taking of various depositions and exchange of written discovery and documents.[8] Discovery has also been conducted in this action relating to the claims in the State Action. Most critically, the Waverly Defendants have responded to interrogatories which sought identification of the injuries for which they were seeking relief in the State Action and specification of all damages sought in that

---

[7] In addition to the above alleged defects, the State Action Amended Complaint alleges that the Lacey Defendants failed to deed the property on which some or all common areas are located to Waverly HOA. *Id.* at ¶ 24. It also alleges that the Lacey Defendants failed to establish adequate reserves before turning the property over to Waverly HOA. *Id.* at ¶ 27. There does not, however, appear to be any dispute that these allegations could not give rise to coverage under the liability provisions of the Builders Mutual policies.

[8] *See, e.g.,* Dkt. No. 44-6 (Burch deposition), Dkt. No. 44-7 (Brown deposition); Dkt. No. 44-10 (photographs taken by Brown); Dkt. No. 58-1 (Applied Building Sciences Inc., Engineering Report); Dkt. No. 59-1 (Earth Structures, Inc., Proposal); Dkt. No. 59-2 (Geo-Systems Design & Testing, Inc., Engineering Report dated September 16, 2009); Dkt. No. 59-3 (Smith deposition); Dkt. No. 60 (Geo-Systems Design & Testing, Inc., Engineering Report dated September 1, 2009); Dkt. No. 62 (Kyzer & Timmerman, LLC, documents); Dkt. No. 62-1 (Terratech documents); Dkt. No. 62-2 (Storm Drainage Evaluation).

action. *See* Dkt. No. 59 at 8 (disclosing the following bases for their claims: (1) inadequate retaining walls which fail to prevent erosion and silting; and (2) cracks in foundation slabs which "are greater in size and frequency tha[n] those normally expected in concrete foundation slabs"); *id.* at 9 (responding to request to specify all damages sought by referring to various engineering and repair costs for retaining walls, slabs, plumbing, and drainage).[9]

While it is not entirely clear whether discovery has been *completed* in the State Action, the presence of all of the same parties in this action has provided all Defendants an opportunity to present any additional evidence relevant to the issue of coverage. While Defendants have pointed to a few specific passages from Brown's deposition, which was attached to Builders Mutual's motion, they have not proffered any additional evidence or suggested any reason the factual record here is not complete.[10] The evidentiary record is, therefore, deemed sufficient to resolve the present motion.

---

[9] Numerous categories are specified with only a "TBD" disclosure as to amount. The categories include costs for engineering and development of "repair scope of work" (nature of work not disclosed); proposal for replacing retaining walls, work on retention/detention ponds and underground drainage (apparently for off-site work); geotechnical and engineering evaluation of soil preparation and concrete foundation slab work and flatwork; costs to repair floor slabs and exterior concrete flatwork; costs to repair under-slab plumbing and slabs; reserve for future repairs to the same, cost to remove and replace artificial stucco siding; and increased dues for repairs to the common areas.

[10] Relying solely on allegations of the complaint, Defendants' proffered supplemental expert report suggests there are open "questions of fact" which preclude summary judgment. The report does not, however, suggest that more discovery is needed. Similarly, though Defendants make several references to "genuine issues of material fact" in their opposition memorandum, they do not suggest the need for further discovery before summary judgment may be decided. Dkt. No. 48 at 11-13. Thus, neither Defendants' memorandum nor their supplemental expert report supports deferring resolution of this motion pursuant to Fed. R. Civ. P. 56(d).

**Retaining Walls.**

There are two retaining walls at issue. One, to the south of the development ("South Retaining Wall"), retains soil from a higher elevation, preventing it from falling or washing onto Waverly Place common areas. *See generally* Dkt. No. 58 at 8 (Builders Mutual Reply discussing report of Waverly Defendants' expert).[11] Another retaining wall to the north of the development ("North Retaining Wall"), retains soil which is part of Waverly Place, preventing it from eroding and washing onto property at a lower elevation. Dkt. No. 58 at 9-11. Brown's unit, No. 132, is on the north side of Waverly Place and adjoins the North Retaining Wall. Dkt. No. 58-1 at 4-5; Deposition of Brown ("Brown dep.") at 39 (Dkt. No. 44-7 at 11).

Gary Burch ("Burch") personally built the retaining walls. Deposition of Gary Burch ("Burch dep.") at 12, 27-28 (Dkt. No. 44-6). Burch is a member in Lacey & Associates and an employee of Lacey Construction. *Id.* at 17-19, 54-55).

**South Retaining Wall.** The Waverly Defendants' expert has not identified any structural problems with the South Retaining Wall. Smith dep. at 16 (discussed in Dkt. No. 58 at 8). He did, however, suggest that it may fail at some point in the future if not properly maintained and

---

[11]  In their collective response, Defendants refer to allegations that the "retaining walls are inadequate to support the soil they were built to retain, or prevent erosion and silting" and "will have to be repaired." Dkt. No. 48 at 2; *see also id.* at 9 (quoting allegation that "the retaining walls fail 'to support or restrain the soils against which they were built' and to 'prevent erosion and silting from surrounding properties into and onto the common areas and individual lots in Waverly Place.'"). These allegations make no distinctions between the different walls and fail to identify the nature of the alleged defects. Defendants also refer to testimony from Brown that the "retaining wall behind his unit is damaged and allows erosion." *Id.* at 3. No greater detail is provided. Builders Mutual, by contrast, has directed the court to substantial record evidence which establishes that there are two retaining walls, one to the south (retaining soil from a higher elevation from falling onto Waverly Place property) and one to the north (retaining soil from eroding away from Waverly Place property). Dkt. No. 58 at 8-10 (discussing Waverly Defendants' expert report and deposition in State Action and documents from Kyzer & Timmerman, LLC).

recommended replacement. Smith dep. at 17. The damages sought in the State Action include costs related to replacement of the South Retaining Wall.

No evidence has been proffered that the South Retaining Wall has actually failed resulting in any damage to any other property at issue in this action (*i.e.*, common areas owned by Waverly HOA or the individual unit owned by Brown, which is located on the opposite side of Waverly Place). At most, there is evidence that there is sometimes flooding below the South Retaining Wall during heavy rains which may have caused damage to individual units other than Brown's.[12] There is no evidence that this has caused other damage for which the Waverly Defendants seek recovery in the State Action. *See supra* n.12; Dkt. No. 59 at 8-9 (Waverly Defendants' interrogatory response regarding damages sought in State Action).[13]

**North Retaining Wall.** The North Retaining Wall buckled to some degree during construction in 2002. *See* Burch dep. at 9, 11-12. Burch responded by hiring an engineer, Kyzer & Timmerman, LLC ("Kyzer"), to assist with reinforcing the wall. *Id.* at 13-14. The completed repairs stabilized the wall without restoring it to a fully upright position. *Id.*; *see also* Dkt. No. 62 (Documents from Kyzer reporting wall stabilized in May-June 2003). After the State Action was filed, Burch inspected the wall and found it to be in the same condition as after the initial stabilization. Burch dep. at 11,15.

---

[12] Brown testified that he has seen flooding below the South Retaining Wall and believes it has caused some flooding in units on that side of Waverly Place. Brown dep. at 81.

[13] Defendants do not direct the court to any other evidence of damage from failure of the retaining walls. Their only reference to any specific resulting damage is Brown's testimony that defects in or failure of the retaining wall *behind his unit* has caused erosion including sinkholes. His unit is, however, on the north of the development. Thus, he would not have been referring to the South Retaining Wall.

This evidence suggests that whatever defects exist in the North Retaining Wall are not only the result of deficiencies in the initial construction of the wall, but also remain unchanged from the time of construction. No contrary evidence has been presented. Thus, any "damage" to the North Retaining Wall itself is not the result of some independent event or even damage which has developed over time due to "exposure" to some harmful condition. *See infra* at 13 (policy definition of "occurrence").

As noted above, Brown's unit, number 132, is on the north side of the development and adjoins the North Retaining Wall. *See* Dkt. No. 58-1 at 4 (Applied Building Sciences, Inc., Engineering Report ("ABS Report")); Dkt. No. 59-2 at 5-6 (Geo-Systems Design & Testing Inc. Report dated September 16, 2009 ("Geo-Systems Second Report")). Soil behind Brown's unit has eroded, leaving sink holes. *Id.* This erosion has been attributed to deficiencies in the retaining wall by at least two engineering reports and by Brown himself. *Id.*; *see also* Brown dep. at 41-42, 54-44. The North Retaining Wall is at a lower elevation than Brown's unit. Consequently, the erosion is washing soil away from Brown's property. Brown dep. at 39; see also Dkt. No. 44-10 (photos produced by Brown). Neither Brown nor Waverly HOA has expended any funds to repair the retaining wall. Brown dep. at 59-60, 62-63.

**Concrete Foundation Slab(s).** Burch personally supervised the construction work at the project. Burch dep. at 25-27, 54-56. He was not, however, responsible for pouring the concrete foundation slabs as this work was done by a subcontractor. *Id.* at 29-30, 33-34. In 2004, a unit owner discovered and reported a crack in the foundation of his or her unit. *Id.* at 16-17. Burch repaired this crack by sealing it with a patching material. *Id.*[14]

---

[14] Builders Mutual suggests this crack was discovered and repaired during the construction process and that this demonstrates that any cracks in Brown's unit also occurred during construction and are excluded for that reason. The record evidence does not support Builders Mutual's proposed

Brown, who was deposed on September 18, 2009, testified he discovered cracks in his concrete foundation slab when he was replacing carpet, approximately two years before his deposition.  Dkt. No. 44-7 at 24-25.  This suggests the cracks were first discovered in mid to late 2007, not long after the period covered by Builders Mutual's policies (November 22, 2002, through April 6, 2007).   Brown observed some discoloration around the cracks, which he assumes might have been due to moisture.  He did not, however, notice any water intrusion at the time, had experienced no related problems prior to pulling up the carpet, and has not experienced any subsequent problems with the replacement (laminate) flooring. *Id.* at 25-27, 31-32.  Brown did not report the cracks to the builder when they were discovered.  *Id*. at 29.

Roughly six months before his deposition (approximately March 2009), Brown's unit developed a leak in the closet of the master bedroom. *Id.* at 32.  Brown eventually determined that the leak was related to a leak in a water line outside his unit. *Id*. at 33.  Although Brown surmises that the leak in his closet is related to the cracks in his foundation (which he discovered under a different area of the floor when he replaced flooring in 2007), he has not proffered any evidence of a causative link.[15]

---

factual inferences, at least not as a matter of law.  First, it is not clear whether construction was still ongoing in 2004.  Second, that the unit had a "homeowner" suggests that the unit in question may have been complete.  Finally, the unit was not Brown's unit. *See* Burch dep. at 49-50 (indicating Brown never complained to Burch of any cracks in the concrete foundation of his unit).  It is, therefore, entirely possible that the cracks in Brown's unit did not develop until after construction was complete.

[15]  Defendants only reference to the leak in their statement of facts is as follows: "Brown testified that his unit developed a leak in the closet and that it was related to alleged water damage. (Deposition of Michael Brown, p. 32-33)."  Dkt. No. 48 at 2.  In later arguments, Defendants state that the possibility that there is some connection between the cracks in the slab and the leak (or some other as-yet-unspecified damage) has not been conclusively ruled out. *Id*. at 11.  They do not, however, point to even a scintilla of evidence that the cracks in the slab have, in fact, caused some other damage to Brown's unit including as a result of water seepage through the foundation.

**Drainage Problems.** In its opening memorandum, Builders Mutual focuses on the two categories of defects which the Waverly Defendants identified as at issue in their interrogatory responses: retaining walls and concrete foundation slabs. *See* Dkt. No. 44-1 at 11-12 (memorandum discussing evidence of damages); Dkt. No. 59 at 8 (listing retaining walls and slabs in response to interrogatory seeking "all construction defects, deficiencies, and property damage" on which the claims in the underlying case are based).

In their opposition memorandum, Defendants include a block quotation from the Amended Complaint which includes a single reference to drainage problems but does not otherwise address this category of alleged defect or damages. *See* Dkt. No. 48 at 8. It would not, therefore, appear that Defendants are claiming coverage for any damages which might be awarded relating to defective drainage. No party has, in any event, directed the court to any evidence that either of the Waverly Defendants has suffered an injury to themselves or their property because of any drainage problem. It further appears from Builders Mutual's reply that some or all of the work necessary to cure the alleged drainage problem would be performed on "downstream" property which is not owned by either of the Waverly Defendants and is, instead, owned by one or more of the Lacey Defendants.

### III.    Policy provisions.

Builders Mutual insured Lacey Construction through commercial general liability (CGL) policy number CPP 0013265. Dkt. No. 44-11 ("Initial policy"). The Initial Policy covered a period of one year beginning on November 22, 2002. *Id.* It was renewed annually until it was cancelled on April 6, 2007. Dkt. No. 44-12 ("Final Policy"). Lacey & Associates was added to the policy as an insured effective August 1, 2005. Dkt. No. 44-13 (Amended Declarations).

The series of policies beginning with the Initial Policy and ending with the Final Policy contain the following relevant provisions:

11

SECTION I – COVERAGES
COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.      Insuring Agreement

        a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .

        b. This insurance applies to "bodily injury" and "property damage" only if:

                (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

                (2) The "bodily injury" or "property damage" occurs during the policy period . . . .

                                    * * *

2.      Exclusions

        This insurance does not apply to:

                                    * * *

        j.  Damage To Property

                "Property damage" to:

                (1)  Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property.

                                    * * *

        l.      Damage To Your Work

                "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

        This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor. [This exception from the exclusion was removed by an endorsement beginning with the 2004-05 policy]

                                    12

* * *

SECTION V – DEFINITIONS

* * *

13.     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

* * *

16.     "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

* * *

(2)   Work that has not yet been completed or abandoned. . . . .

* * *

17.     "Property damage" means:

a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it . . . .

* * *

22.     "Your work":

a.  Means:

(1)  Work or operations performed by you or on your behalf; and

(2)  Materials, parts or equipment furnished in connection with such work or operations.

b.  Includes:

(1)  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2) The providing of or failure to provide warnings or instructions.

Dkt. No. 44-11; *see also* Dkt. No. 44-14 (modified "your work" exclusion from 2004-05 policy year forward).

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (as amended December 1, 2010). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## DISCUSSION

### I.     Expert Opinion

Before addressing the parties' substantive arguments, the court addresses one evidentiary issue: admissibility of the supplemental report of the Lacey Defendants' proffered expert Constance

14

Anastopoula, Esquire ("Anastopoula").  Anastopoula's supplemental report, which is cited only once in Defendants' response, consists of a discussion of legal principles drawn primarily from *Crossmann Communities of North Carolina, Inc. v. Harleysville Mutual Ins. Co.*, 717 S.E.2d 589 (S.C. 2011) which Anastopoula purports to apply to the "facts" of this case.  As to each covered subject matter, Anastopoula concludes that the court should deny summary judgment because there are "questions of fact."  Anastopoula supports her conclusions that there are "questions of fact" by referring to allegations in the "underlying complaint."  She neither mentions nor discusses a single item of evidence.

It is doubtful that Anastopoula's supplemental report (or related testimony) would be admissible under any circumstances.  This is because it improperly invades the province of the court by advising the court how it should apply the law.  *See U.S. v. McIver*, 470 F.3d 550, 561-62 (4th Cir. 2006) ("opinion testimony that states a legal standard or draws a legal conclusion by applying the law to the facts is generally inadmissible").

Even without this fundamental difficulty, the court would not find Anastopoula's supplemental report helpful for three reasons.  First, the supplemental report confuses the standard applied to motions to dismiss (which considers *allegations* of the complaint) with the standard applied to motions for summary judgment (which considers the *evidentiary record*).  *See, e.g.*, Dkt. No. 48 -1 at 3 ¶ 5.a. (suggesting that "allegations in the underlying complaint" constitute "evidence presented" as to defects in retaining walls); *id. ¶* 5.d. (concluding that the *allegations* raise "a question of fact [which is] not appropriate for Summary Judgment");  *id. ¶¶* 6.a., 6.d. (same erroneous pairing of concepts as to cracks in the foundation slab).[16]  A second, related problem is

---

[16] Even Anastopoula's repeated reliance on the existence of "questions of fact" ignores the relevant standard which considers whether there are *genuine* issues of *material* fact.

that the supplemental report includes no discussion of the substantial evidence on which Builders

Mutual relies.  Third and finally, the supplemental report's application of the law to the "facts" is

entirely conclusory.  Thus, it would not be helpful even if considered as a legal memorandum.

  For all of the reasons indicated above, the court will not consider the expert report offered

by Defendants in opposition to Builders Mutual's motion.

## II. Construction of Insurance Policies

  Under South Carolina law, insurance policies are interpreted according to the same rules of

construction applicable to other types of contracts.  *Auto-Owners Ins. Co. v. Carl Brazell Builders,*

*Inc.*, 588 S.E.2d 112, 115 (S.C. 2003) ("*Brazell*").  Thus, the court "must give policy language its

plain, ordinary and popular meaning. . . . When a contract is unambiguous, clear, and explicit, it

must be construed according to the terms the parties have used."  *Id.*; *see also B.L.G. Enterprises,*

*Inc. v. First Fin. Ins. Co.*, 491 S.E.2d 695, 697 (S.C. Ct. App. 1997) ("The construction of a clear

and unambiguous contract is a question of law for the court."  ), *aff'd*, 514 S.E.2d 327 (S.C. 1999).

The court's "duty is limited to the interpretation of the contract made by the parties, regardless of

its wisdom or folly, apparent unreasonableness, or failure [of the parties] to guard their interests

carefully."  *B.L.G. Enterprise*s, 514 S.E.2d at 330 (internal quotation marks omitted).

  Exclusions in insurance policies are generally narrowly construed in favor of coverage.

However, "[c]ourts may not torture the ordinary meaning of language to extend coverage expressly

excluded by the terms of the policy."  *S.C. Mun. Ins. & Risk Fund v. City of Myrtle Beach*, 628

S.E.2d 276, 278 (S.C. Ct. App. 2006).  Moreover, "insurers have a right to limit their liability and

to impose conditions on their obligations provided they are not in contravention of public policy or

a statutory prohibition."  *S.C. Farm Bureau Mut. Ins. Co. v. Dawsey*, 638 S.E.2d 103, 104-05 (S.C.

Ct. App. 2006).

16

### III.    Duty of Indemnification

The present action addresses only Builders Mutual's duty of indemnification, not its duty to

defend.  Under South Carolina law, a liability insurer's duty to indemnify is determined by the

findings of the fact finder in the underlying case.  *Ellett Bros., Inc. v. U.S. Fid. & Guar. Co.*, 275

F.3d 384, 388-89 (4th Cir. 2001) (citing *Jourdan v. Boggs/Vaughn Contracting, Inc.*, 476 S.E.2d

708, 711 (S.C. Ct. App. 1996)).

Because the State Action has not yet been tried, the court applies here something of a double

summary judgment standard.  That is, in deciding whether Builders Mutual is entitled to summary

judgment that it owes no duty of indemnification in the State Action, the court considers whether

there is evidence from which a reasonable jury *in the State Action* could find in favor of the Waverly

Defendants on any claim which the court *in this action* could find entitles the Lacey Defendants to

indemnification under Builders Mutual's policy.

Builders Mutual's policies require it to indemnify the Lacey Defendants for damages the

insureds are legally obligated to pay because of "'property damage' . . . caused by an 'occurrence'

. . . [which] occurs during the policy period[.]" Policy § I.A.1.a.,b.  "Property damage" is defined

as "[p]hysical injury to tangible property, including all resulting loss of use of that property." *Id.* §

V.17.  "Occurrence" is defined as "an accident, including continuous or repeated exposure to

substantially the same general harmful conditions.' " *Id.* § V.13.  Property damage caused by an

occurrence is covered unless it is subject to one or more exclusions.[17]

### IV.    Purely economic losses caused by breach of contract,  breach of warranty or unfair trade practices are not covered by the CGL Policy.

---

[17]  Builders Mutual relies on various exclusions including (1) an exclusion of damage to property owned, rented or occupied by the insured, even if repairs to that property are necessary to avoid injury to a third-party or the third-party's property, and (2) an exclusion of damage to the insured's own work (with a subcontractor exception applicable during some policy periods).

Several of the causes of action in the State Action are founded on contractual or statutory trade practices theories. These include causes of action for breach of contract, breach of warranty, and unfair trade practices. Through these causes of action, the State-Action plaintiffs seek economic damages for deficiencies in the quality of the Lacey Defendants' work or for their failure to meet other contractual obligations (such as by establishing adequate reserves).

To the extent damages sought in the State Action are for inadequate reserves or failure to record a deed, they do not involve physical injury and, consequently, cannot satisfy the definition of property damage. The same is true as to other purely economic damages such as for the reduced value of the product or insured's workmanship. *See Brazell*, 588 S.E.2d at 115-16 (holding allegations of purely economic losses, including *some* relating to diminution in value of homes flowing from presence of undisclosed hazardous materials did not constitute "property damage" under a CGL policy); *see also Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 459 S.E.2d 318, 320 (S. C. Ct. App. 1994) ("A general liability policy is intended to provide coverage for tort liability for physical damage to the property of others; it is not intended to provide coverage for the insured's contractual liability which causes economic losses.").

Builders Mutual is not, therefore, obligated to indemnify the Lacey Defendants for any relief awarded under the breach of contract, breach of warranty, or unfair trade practices claims to the extent damages are awarded for the difference between what was promised and what was delivered. This would include, for example, any claim for diminution in value, failure to deliver deeds, or failure to establish adequate reserves.

**V.    Claims for faulty workmanship that damages only the insured's work product are not covered under CGL policies.**

Even if obtained under a tort-based theory, damages for defective work are not covered under a CGL policy except to the extent the defective work caused physical injury to some other property. This conclusion follows the line of South Carolina cases discussed below, which have relied either on the definition of "occurrence" (earlier cases) or on the definition of "property damage" (later case) in concluding that CGL policies do not provide coverage for damage to the defective work itself.

In one of the earlier cases, *L-J, Inc. v. Bituminous Fire and Marine Ins. Co.*, 621 S.E.2d 33 (S.C. 2005), the court held that premature deterioration of roads which resulted from the insured contractor's faulty workmanship was not covered because it was not the result of an "occurrence." As explained in *L-J*, which adopted the majority rule that defective workmanship which damages only the product itself is not an occurrence, "If [the court] were to hold otherwise, the CGL policy would be more like a performance bond, which guarantees the work, rather than like an insurance policy, which is intended to insure against accidents." *Id.* at 36.[18]

The rule adopted in *L-J* was applied to a case involving defective construction of homes in *Auto-Owners Ins. Co., Inc. v. Newman*, 684 S.E.2d 541 (S.C. 2009) ("*Newman*"). In *Newman*, the court was faced with claims for defective application of stucco by a subcontractor and related

_____

[18] *See L-J*, 621 S.E.2d at 35 (noting that "[a] majority of other jurisdictions deciding this issue have held that faulty workmanship standing alone, resulting in damage only to the work product itself, does not constitute an occurrence under a CGL policy."); *id.* at 36 (noting that, "[a]lthough the alligator cracking [of the roadway] may have constituted property damage, we find that an 'occurrence,' as defined under the CGL policy, did not take place."); *id.* (finding the alleged "negligent acts constitute[d] faulty workmanship, which damaged the roadway system only. And because faulty workmanship is not something that is typically caused by an accident or by exposure to the same general harmful conditions, we hold that the damage in this case did not constitute an occurrence.").

damage to the home's framing and exterior sheathing.  Critically, the framing and sheathing were not part of the subcontractor's work.  The court held that the "negligent application of the stucco [did] not on its own constitute an 'occurrence[.]'" *Id.* at 544.  By contrast, "the continuous moisture intrusion resulting from the [negligent application of the stucco was] an occurrence" because it was an unexpected and unintended "'accident' – involving 'continuous or repeated exposure to substantially the same harmful conditions.'" *Id.* at 545.  Because the policy included a subcontractor exception from the "your work" exclusion, these combined rulings resulted in coverage for the damage to the framing and exterior sheathing, but not for the defective stucco work itself.  *See id.* at 545-46 (also holding replacement of the stucco could not be covered as "an incidental cost to repairing the damage to other property").

The South Carolina Supreme Court recently reaffirmed the result in *Newman*, albeit based on modified reasoning.  *See Crossmann Communities of N.C., Inc. v. Harleysville Mut. Ins. Co.*, 717 S.E.2d 589, 593 (S.C. 2011) (noting continued "adher[ence] to the result in *Newman*," which relied on interpretation of the term "occurrence" to hold "that the costs of replacing the defective application of the stucco were not covered . . . but the damage caused by the continuous moisture intrusion resulting from the [defective application was covered]").  The analysis in *Crossman* differed from that in *Newman* and *L-J* because it focused on whether there was "property damage" rather than whether there was an "occurrence."  *Id.*  As the court explained:

> With respect to the first quoted definition of "property damage," the critical phrase is "physical injury," which suggests the property was not defective at the outset, but rather was initially proper and injured thereafter.  We emphasize the "difference between a claim for the costs of repairing or removing defective work, which is not a claim for 'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for property damage.'" [citing cases from multiple jurisdictions]

* * *

Returning to *Newman* and viewing those facts through the lens of both "property damage" and "occurrence," we clarify that the cost to replace the negligently constructed stucco did not constitute "property damage" under the terms of the policy. The stucco was not "injured." However, the damage to the remainder of the project caused by water penetration due to the negligently installed stucco did constitute "property damage."

\* \* \*

In sum, we clarify that negligent or defective construction resulting in damage to otherwise non-defective components may constitute "property damage," but the defective construction would not.

*Id.* at 593-94.

Defendants argue that *Crossman* is no longer good law in light of a May 17, 2011 amendment to South Carolina's insurance law which provides that "occurrence" must be defined to include "property damage . . . resulting from faulty workmanship, exclusive of the faulty workmanship itself." *See* Dkt. No. 48 at 9 (characterizing *Crossman* as holding "that damages resulting from an insured's faulty workmanship did not qualify as an *occurrence*" (emphasis added) and arguing that S.C. Code Ann. § 38-61-70 (2011) was enacted specifically to overrule *Crossman*).[19]

This argument is curious on several levels. First, the particular *Crossman* decision on which Builders Mutual relies and which Defendants cite in their opposition memorandum is the final version after rehearing, issued on August 22, 2011. This decision was not only issued two months *after* adoption of the referenced statute, but refers to the statute in a footnote. *See Crossman*, 717 S.E.2d at 594 n.6 (declining to "address recent legislation that seeks in part to impose a construction

---

[19] Section 38-61-70 purports to apply to "any pending or future dispute over coverage that would otherwise be affected by this section as to all commercial general liability insurance policies issued in the past, currently in existence, or issued in the future." S.C. Code Ann. § 38-61-70 (E).

on existing insurance policies in pending actions," and identifying the Act which was codified as Section 38-61-70). Second, the final *Crossman* decision *reversed* the position taken in the South Carolina Supreme Court's earlier opinion in the same case (which, presumably, motivated the adoption of Section 38-61-70). Third, the final *Crossman* decision is *consistent* with the critical portion of Section 38-61-70 which would exclude "the faulty workmanship itself" from the definition of "occurrence" (likely mooting any argument that the statute impermissibly impairs existing contracts). Finally, the Lacey Defendants' own expert relies extensively on the final decision in *Crossman* without any reference to Section 38-61-70.

For all of these reasons, the court concludes that Section 38-61-70 does not modify the rule set down in *Crossman* which clarified the reasoning but did not change the result in *Newman* and *L-J*. It follows that Builders Mutual is not obligated to indemnify the Lacey Defendants for any damages which a jury in the State Action may award for repair or reconstruction of defectively constructed components at Waverly Place. By contrast, Builders Mutual may be obligated to indemnify the Lacey Defendants to the extent there is a finding that some defectively constructed component at Waverly Place caused injury to some other component. For reasons explained below, when applied to the evidence presented to this court, this conclusion establishes that, at most, Builders Mutual may be obligated to indemnify the Lacey Defendants for replacing and packing eroded soil above the North Retaining Wall.[20]

_____

[20] As explained below, Builders Mutual is not responsible for any damage which is collateral to repair work for which it is not also responsible. Its duty of indemnification for replacing and repacking soil would, therefore, be limited to repairing conditions which existed at the end of its coverage term, and would not cover any soil replacement made necessary by repair work which may be performed in the future.

**A.    Retaining walls.**

The court will assume for purposes of this order that the evidence in the State Action is sufficient to establish that both of the retaining walls built by Burch, working on behalf of the Lacey entities, are defective in one or more respects and that the Lacey Defendants may be held liable for the cost of replacing or repairing those walls either on a contract or negligence theory.  Regardless of the theory of recovery, Builders Mutual would not be obligated to indemnify the Lacey Defendants for the cost of repairing or rebuilding the walls, or any incidental demolition or reconstruction necessitated by the repair, as this does not qualify as "property damage" under *Crossman*.

Despite significant discovery in the State Action, and their own control over the relevant evidence, Defendants fail to direct the court to any evidence that the alleged defective condition of the retaining walls has injured any *other property* belonging to the Waverly Defendants.  The only exception is evidence of soil erosion which has caused sink holes on Brown's property immediately above the North Retaining Wall.  The erosion and sink holes are arguably "property damage" caused by the defective condition of the North Retaining Wall.  Thus, they may constitute property damage caused by an occurrence falling within the coverage definition of the policy.

The court, therefore, concludes that, as a matter of law, Builders Mutual has no obligation to indemnify the Lacey Defendants for damages measured by the cost to repair either retaining wall or any incidental costs including for removal or replacement of soil, patios, fences or other property which must be moved in order to make the repairs.  This ruling does not, however, reach the costs which might be incurred to replace or repack eroded soil above the North Retaining Wall to the extent the erosion occurred during Builders Mutual's time-on-risk and is located on Brown's individual property or property owned by Waverly HOA (if any).  *See Crossmann*, 717 S.E.2d at

23

603 ("In sum, we construe the standard CGL policy to require that each insurer cover only that portion of a loss attributable to property damage that occurred during its policy period.").

Builders Mutual argues that the sink holes themselves are not covered property damage because the sink holes are "incidental to the repair or replacement of the retaining walls, since the soil will have to be removed in order to replace the retaining walls." Dkt. No. 58 at 10-11 (citing *OneBeacon Ins. Co. v. Metro Ready-Mix, Inc.*, 242 Fed. Appx. 936, 940-41 (4th Cir. 2007). This argument takes the ruling in *OneBeacon* too far as that case addressed damage which would be *caused by* the repairs. Here, the damage exists prior to the repairs, even though replacing the currently missing soil may be something of a redundant exercise as the same areas may need to be removed and replaced in conjunction with the repair of the North Retaining Wall.

### B. Cracks in the Concrete Foundation Slab.

To the extent the State Action seeks relief for cracked slabs, it seeks relief on behalf of individual unit owners. Because the state court denied class certification, the only individual unit owner in this action is Brown. Thus, for purposes of this motion, the court considers the testimony relating to the cracked concrete foundation slab in Brown's unit.

Brown testified that he found cracks in his slab when he replaced the carpet approximately two years prior to his September 2009 deposition. The court, therefore, assumes that there is evidence the cracks existed no later than September 2007. The only damage Brown observed at that time was limited to the cracks in the slab itself which had not, at that point, caused any further damage such as injury to carpet or flooring materials due to water intrusion through the cracks. Thus, the only damage relating to the slab identified as of mid to late 2007 falls into the category of damages excluded from coverage under *Crossman* (defects in the work product itself). It follows that Builders Mutual is not obligated to indemnify the Lacey Defendants for any damages relating

to repair or replacement of the concrete foundation slab including any incidental costs such as removing and replacing flooring or plumbing.

The date Brown recalled discovering the cracks, roughly two years before September 2009, would fall shortly after the last date covered by Builders Mutual's insurance policies (which expired or were cancelled on April 6, 2007).   If the foundation cracks subsequently caused injury to other property, including due to water leaks which entered the home because of the cracks, that injury would not be covered by Builders Mutual because it no longer had a policy in place. *See generally Crossmann*, 717 S.E.2d at 603 (quoted *supra* at 24).  In sum, we construe the standard CGL policy to require that each insurer cover only that portion of a loss attributable to property damage that occurred during its policy period.").[21]

## VI.     Owned property exclusion.

Builders Mutual also relies on a policy exclusion for "property damage to property you own, rent, or occupy." Dkt. No.44-10 §I.A.2.j.(1).  This exclusion prevents a CGL (liability) policy from providing first-party benefits to the insured.  *See Isle of Palms*, 459 S.E.2d at 320 ("A general liability policy is intended to provide coverage for tort liability for physical damage to the property of others."); *see also State Farm Fire & Cas. Co. v. English Cove Ass'n, Inc.*, 88 P.3d 986, 988, 992 (Wash. Ct. App. 2004) (noting "owned property" exclusion bars coverage to the extent of losses to the insured's own property").

---

[21] Brown testified that he discovered a water leak roughly six months before his deposition in a different part of his unit from where he had earlier observed cracks in the foundation.  Thus, the leak first manifested itself roughly eighteen months after Brown discovered the cracks and roughly two years after the Final Policy expired.  No other evidence is offered from which a jury might conclude that (1) the leak was caused (or facilitated) by cracks in the concrete foundation slab, or (2) the leak or cracks in the slab caused any damage during Builders Mutual's time-on-risk (if they caused any damage at all).

To the extent either retaining wall is, in fact, owned by one of the Lacey Defendants, this exclusion would also preclude coverage of repairs. The same holds true for any grading or other work which might be required on separate property belonging to the Lacey Defendants in order to improve drainage on property belonging to the Waverly Defendants. This is both because of the owned property exclusion and because any "defect" in the drainage areas would not be "property damage" with respect to the Waverly Defendants.[22]

## VII.     Other Exclusions and Arguments

Builders Mutual raises additional arguments against coverage. The court declines to reach these arguments as they would not modify the result here.

### CONCLUSION

For the reasons set forth above, the court concludes that Builders Mutual has no obligation to indemnify the Lacey Defendants for any damages which may be awarded in the State Action for evaluating, repairing, or rebuilding concrete foundation slabs and retaining walls or for related diminution in value of Waverly Place or Brown's unit. This includes damages attributable to incidental work such as removal and replacement of flooring, soil, patios, or fences. The court reaches the same conclusion as to any damages which may be awarded to correct drainage problems or for any failure to deed property or establish adequate reserves. Builders Mutual may, by contrast, be required to indemnify the Lacey Defendants for damages relating to erosion above the North Retaining Wall, limited to those damages attributable to erosion which (1) occurred during Builders Mutual's time-on-risk and (2) is present on property owned by Brown or Waverly HOA.

---

[22] This is not to say that defects in off-site drainage areas could not cause property damage due to an occurrence on-site. No evidence of such on-site damage has, however, been presented. At most, there is evidence that some individual property owners who are not parties to this action may have suffered some flooding at some point in time which might have caused property damage.

These rulings resolve the declaratory judgment issues before this court.  The matter is, therefore, dismissed with prejudice as to all coverage issues addressed herein.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
March 27, 2012